UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HUMANE WORLD FOR ANIMALS
1255 23rd Street, NW, Suite 450
Washington, District of Columbia 20037

HUMANE WORLD ACTION FUND
1255 23rd Street, NW, Suite 455
Washington, District of Columbia 20037

PAULINE STOTSENBERG
744 S. Figueroa #3512
Los Angeles, California 90017

JANA BABUSZCZAK
6315-B FM 1488 Road, Box 144
Magnolia, Texas 77354

WILLIAM COON
7876 W. Canyon Road
Herriman, Utah 84096

FRAN COLE
3811 Reige Lane
Deerfield, Wisconsin 53531

JACQUELINE KASSLEMAN
1357 N. Scandia Drive
Pueblo West, Colorado 81007

*Plaintiffs,*

v.

UNITED STATES DEPARTMENT OF AGRICULTURE,
1400 Independence Avenue, SW
Washington, District of Columbia 20250

ANIMAL AND PLANT HEALTH INSPECTION SERVICE,
4700 River Road
Riverdale, Maryland 20737

Civil Action No. 26-1372

**Complaint for Declaratory and Statutory Relief**

BROOKE ROLLINS, in her official capacity as Secretary of the United States Department of Agriculture,
1400 Independence Avenue, SW
Washington, District of Columbia 20250

KELLY MOORE, in her official capacity as Acting Administrator of The Animal and Plant Health Inspection Service,
4700 River Road
Riverdale, Maryland 20737

*Defendants.*

## INTRODUCTION

1. Plaintiffs bring this lawsuit to ensure that the federal government complies with its obligations under the Administrative Procedure Act, 5 U.S.C. §§ 551-559 (APA), and the Horse Protection Act, 15 U.S.C. §§ 1821-1831 (HPA), a law in place since 1970 that was intended to protect some of our most cherished animal companions—horses.

2. In 1970, Congress passed the HPA to eliminate the cruel practice of "horse soring," whereby trainers intentionally inflict pain on a horse's legs, ankles, or hooves to force the horse to perform an exaggerated high stepping show gait known as the "Big Lick." *See* 15 U.S.C. §§ 1821-1831. Soring involves brutal techniques designed to cause the horse severe discomfort with every step, including the application of caustic chemicals such as mustard oil or kerosene to the horse's skin.

3. The HPA prohibits the showing, exhibition, transport, sale, or auction of horses that are sore. *Id.* at § 1824. Congress delegated to the United States Department of Agriculture (USDA) the obligation to administer and enforce the HPA, 15 U.S.C. § 1823, and USDA, in turn, delegated administration and enforcement of the HPA to its sub-agency, the Animal and Plant Health

Inspection Service (APHIS).[1] Rather than fulfill its congressional mandate, however, the Agency has consistently failed properly to administer or enforce the statute, and most recently has constructively—and unlawfully—withdrawn several rules and procedures that are integral to enforcement of the HPA.

4. First, the Agency has constructively withdrawn 9 C.F.R. § 11.3, commonly known as the "Scar Rule," a final regulation duly promulgated pursuant to the HPA and its 1976 amendments, without the requisite public notice and opportunity for comment required by the APA. The withdrawal of the Scar Rule was also arbitrary and in violation of the APA.

5. Second, the Agency has constructively withdrawn a formal policy known as the "No Showback Rule," *see* APHIS, *USDA Horse Protection Program 2010 Points of Emphasis* (2010), which requires disqualification for the duration of a horse show once a horse is found to be sore, preventing that horse from competing in any additional classes during that event. This abrupt decision to reverse a long-standing policy, without any substantive or reasoned explanation, was arbitrary and capricious in violation of the APA.

6. Third, the Agency has decided not to refer sore horses to show managers for disqualification, even though the HPA mandates disqualification for horses found to be sore. 15 U.S.C. § 1823(a). This decision also violated the APA, as it was arbitrary, capricious, and not in accordance with the requirements of the HPA.

7. Finally, despite explicitly acknowledging for years that the longstanding regulatory enforcement scheme—through which the walking horse industry self-polices—is totally ineffectual to achieve the mandate of the HPA, the Agency has suspended implementation of a

---

[1] USDA and APHIS may be referred to separately or collectively as "the Agency" throughout this Complaint.

long-awaited final rule that would replace that failed system, *see* Horse Protection Amendments, 89 Fed. Reg. 39194 (May 8, 2024) ("2024 Final Rule"). This decision also violated the APA because it was arbitrary, capricious, and not in accordance with the requirements of the HPA.

8. This is not the first time the Agency has unlawfully withdrawn rules promulgated to fulfill its obligations under the HPA. In 2017, following a lengthy administrative rulemaking process, the Agency announced a final rule that would have replaced the failed industry self-policing system and, among other things, prohibited the use of devices known to be associated with soring. However, shortly after the announcement, the Agency abandoned the rule without notice and comment, a decision the Court of Appeals for the District of Columbia Circuit found to be unlawful in a lawsuit brought by several of the plaintiffs here. *See Humane Soc'y of the United States v. United States Dep't of Agric.*, 41 F.4th 564 (D.C. Cir. 2022). And yet, here we are again.

9. It is long past time for the Agency to take its obligations under the HPA seriously and consider the needs of the horses the law was meant to protect over the interests of a segment of the regulated industry that exploits them. Accordingly, Plaintiffs ask the Court to declare unlawful and set aside the Agency's decisions to constructively withdraw the Scar Rule, the No Showback Rule, and the referral of horses to show management for disqualification, and to declare unlawful and set aside the decision to suspend implementation of the 2024 Final Rule. The Plaintiffs also request that the Court order other relief consistent with a finding that the Agency's actions were unlawful.

## PARTIES

10. Plaintiff Humane World for Animals (Humane World), formerly the Humane Society of the United States, is the nation's largest animal protection organization with offices around the world. On behalf of its members, Humane World engages in public education, litigation, investigations, and animal rescue, to combat animal abuse and exploitation and promote

the welfare of all animals. Humane World has deployed all of these tools in service of its decades-long, priority campaign to end the cruel practice of soring horses for competitive advantage at horse shows.

11. Horse soring is a practice that involves the intentional infliction of pain on a horse's limbs and hooves to force an artificial movement rewarded in the show ring. Although methods vary, several practices are common. Some trainers apply caustic chemicals (such as croton or mustard oil) to the lower portion of the horse's legs and/or pasterns, and wrap them tightly with kerosene or other solvents and plastic to "cook" the chemicals into the flesh, causing intense pain when the horse is ridden. Trainers also frequently affix heavy "action devices" (such as metal rollers or chains) over the seared tissue to exacerbate the pain. Other trainers cut horses' hooves down to the delicate tissue, over-tighten metal hoof bands, or jam hard objects, sharp objects, or putty between the horses' pads and soles to cause excessive pressure on the foot. Some trainers attach heavily weighted shoes and tall stacks of pads that force horses to land at an unnatural angle. Many rely on all or a combination of these practices. Once sored, horses experience intense pain when their forefeet touch the ground. As a result, they lift their feet quickly and thrust them forward, and place more weight on their hind quarters, producing the sought-after high-stepping gait. While some sources suggest the desired gait can be achieved through training, evidence shows the extreme expression rewarded in the show ring is not achievable without some form of soring.

12. Humane World is the primary national advocacy organization driving the campaign to end this horrifying practice, drawing upon all the tools at its disposal to do so, including by running public education campaigns regarding the cruelty of soring, presenting at conferences, and drafting and publishing informative blogs, opinion editorials, email alerts to members, and press releases concerning the harms that soring inflicts on horses as well as on honest competition.

13. Humane World's work to protect horses from soring goes beyond traditional issues advocacy. Over the years, Humane World has witnessed first-hand, reported on, and worked with law enforcement on soring through numerous undercover investigations in walking horse training barns. For example, in 2012, a Humane World undercover investigation led to the arrest, indictment on 52 counts (including felonies), and ultimate guilty plea of Jackie McConnell, a notorious trainer of the 1997 Tennessee Walking Horse World Grand Champion horse. In 2015, a similar investigation into soring committed by yet another prize-winning training establishment, ThorSport Farm, confirmed that every horse in training had been sored. And in 2022, Humane World investigators documented cruel soring activities taking place at Formac Stables, the barn of Jimmy McConnell, trainer of four World Grand Champion Tennessee Walking Horses. Humane World staff have also attended numerous walking horse shows to observe enforcement of the HPA and monitor the horses and events firsthand. This work serves to reduce soring by identifying and actively facilitating enforcement activity. Without this work, there would be more soring. But the work requires that enforcement agencies do not shirk their enforcement duties.

14. In addition, Humane World regularly advocates for, and pursues, policy and regulatory change to combat soring, including working tirelessly to ensure that the USDA complies with its statutory obligations under the HPA. This includes meeting with Agency personnel, conducting public education and letter-writing campaigns to the Agency, and closely tracking Agency activities on this issue. Notably, Humane World has submitted rulemaking petitions and voluminous administrative comments concerning the very rules at issue in this case.

15. Defendants' constructive withdrawal of the Scar Rule and the No Showback Rule, its explicit decision not to comply with the disqualification provisions of the HPA, and its abandonment of the implementation of the 2024 Final Rule, mean that even more unlawful soring

will take place and be allowed to occur without penalty or consequence, and that there will be very little, if any, enforcement of the HPA at horse shows.

16. Because the prevention of cruelty to horses is a core business activity for Humane World, these consequences mean that Humane World's business functions are and will be harmed. Because USDA will not engage in enforcement activity it did prior to its unlawful abdication of authority, Humane World must now divert and expend significantly more resources to monitor, publicize, and work to counteract that harm than before these decisions were made. Among other things, Humane World will need to expend resources to send staff to more horse shows to observe, monitor, and publicize the condition of the horses. Humane World has and will need to divert its efforts to more time-consuming and difficult opportunities to protect horses, such as seeking direct enforcement of the HPA itself by U.S. Attorneys' offices.

17. In reliance on the Agency's implementation of the 2024 Final Rule that was supposed to replace the totally ineffective industry self-policing system, and the expected concomitant improvement in enforcement and decrease in soring, Humane World adjusted its internal staffing to redistribute resources to other Equine priorities. Unfortunately, since the Agency made the decisions at issue here, Humane World's equine campaign has had to re-adjust those resource allocations and remove resources from the other high priority equine matters, back to its anti-soring work. Among other things, this has included adding a new staff member to the equine campaign to track enforcement data, and hiring a consultant to advise in areas where current staff lack expertise related to the soring issue. Thus, these Agency decisions have had a very real and detrimental impact on Humane World's resources and core business activities.

18. Humane World brings this action not only on its own behalf in furtherance of its mission, and to protect against further diversion of its limited resources in response to the Agency's unlawful actions, but also on behalf of its members. The interests Humane World seeks to protect

are germane to its organizational purpose and neither the claims nor the relief requested require the participation of individual members, even though, as discussed below, some Humane World members do otherwise have standing to sue in their own right.

19. Humane World's membership includes individuals who are concerned about the welfare of horses in the walking horse industry, some of whom own their own walking horses. These members have associated with Humane World knowing that Humane World will represent their interests in protecting horses. Defendants' constructive withdrawal of the Scar Rule, the No Showback Rule, and the process for disqualification, as well as the repeated suspension of implementation of the 2024 Final Rule, harm Humane World's members by, *inter alia*, preventing them from purchasing tickets to spectate at or participate in walking horse shows and exhibitions reasonably free from soring; putting exhibitors of sound (non-sored) walking horses at a competitive disadvantage against sore horses that are still allowed to compete, thereby removing the members' ability to access the economic benefits of participation as well as the benefits of breeding and selling sound horses; and inflicting the aesthetic and emotional injury of either attending shows with the knowledge that the walking horses being shown—and whom they love—continue to suffer from soring practices widely recognized as cruel, or refraining from attending those shows in order to avoid that injury.

20. Defendants' decisions exacerbate the deficiencies in a regulatory regime that was already inadequate, making it even more certain that soring will go unenforced and become more rampant in the walking horse industry. These harms would be remedied by setting aside the defendants' decisions.

21. Plaintiff Humane World Action Fund (the Action Fund), formerly The Humane Society Legislative Fund, is an animal protection organization incorporated under Section 501(c)(4) of the Internal Revenue Code and operates as a separate lobbying affiliate of Humane

World. The Action Fund was formed in 2004 and is based in Washington, D.C. The Action Fund works to ensure that animals have a voice before federal and state lawmakers and agencies by advocating for measures to eliminate animal cruelty and suffering, and by educating the public on animal protection issues.

22. As a core part of its business functions, the Action Fund has led numerous efforts related to the HPA, including: advocating for robust federal funding to enforce the Act; educating members of Congress on the cruelty associated with horse soring, the limitations of the regulatory scheme and certain aspects of the statutory scheme; advocating for changes or additions to federal law and regulations which would better protect walking horses; and educating the public on the cruelty of soring. In partnership with Humane World, the Action Fund has worked for years through outreach to USDA, regulatory comments, and the coordination of public letter writing campaigns to encourage USDA to properly administer and enforce the HPA.

23. As a result of Defendants' decisions to constructively withdraw the Scar Rule, the No Showback Rule, and the process for disqualifications, as well as the decision to further suspend the 2024 Final Rule, the Action Fund has had to step up education to lawmakers and the public on the harms associated with the soring that is endemic to the walking horse show industry. It must also monitor USDA enforcement of the industry which has been emboldened by these decisions. Defendants' injuries would be remedied if the Agency's decisions were set aside and the Agency were required to comply with the requirements of the HPA and APA.

24. Plaintiff Pauline Stotsenberg, a resident of Riverside County, California, is a Humane World member and a horse owner since 1971. During that time, she has owned and bred over 50 flatshod and barefoot Tennessee Walking Horses. Ms. Stotsenberg holds numerous Horseshow Judging cards. She was building a successful business training, boarding, and breeding walking horses, until she ceased all such business activities because she determined

sound horses could not compete in the industry without adequate enforcement of the HPA by USDA. This resulted in the loss of her business and associated income.

25. Ms. Stotsenberg is also a member of the advisory committee and former judge for Friends of Sound Horses, Inc. (FOSH), a nonprofit organization that promotes the showing of Tennessee Walking Horses without soring. Through FOSH, and as a member of Humane World, she has advocated against soring and supported the development of sound horse competition, foregoing more lucrative business opportunities in showing, training, boarding, and breeding walking horses. The Agency's decisions harm Ms. Stotsenberg because its withdrawal of the Scar Rule, the No Showback Rule, and the disqualification process, as well as its decision to suspend implementation of the 2024 Final Rule, make it even less likely that the HPA will be adequately enforced, and that Ms. Stotsenberg will be able to show her horses again on a fair playing field. Defendants' decisions allow soring violations to go unenforced, causing plaintiff Stotsenberg injury that would be remedied by the setting aside of defendants' decisions.

26. Plaintiff Jana Babuszczak, a resident of Montgomery County, Texas, is a Humane World member and has owned several walking horses since 1987, one of whom was sored without her knowledge or understanding. Although Ms. Babuszczak showed, trained, boarded, and bred walking horses, she ceased training, boarding, and breeding after determining sound horses could not compete fairly in the industry without adequate enforcement by the USDA. Ms. Babuszczak refused to sell horses into an industry that participates in the cruelty of soring, causing her to cease breeding horses for sale and resulting in the loss of her market and associated business opportunities. In addition to being at a competitive and financial disadvantage because she will not sore the horses she shows, Ms. Babuszczak lost at least one training client because she refused to sore horses. As a veterinary technician, Ms. Babuszczak has rehabilitated multiple sored horses and is significantly impacted by her knowledge of how much pain the soring techniques inflict

upon horses. As a member of FOSH, she has advocated against soring and supported the development of sound horse competition, foregoing business opportunities in training, boarding, and breeding walking horses. The Agency's decisions harm Ms. Babuszczak because its suspension of the Scar Rule, the No Showback Rule, and the disqualification process, and its decision to suspend implementation of the 2024 Final Rule allow soring violations to go unenforced, causing plaintiff Babuszczak injury that would be remedied if defendants' decisions were set aside.

27. Plaintiff William ("Bill") Coon, a resident of Salt Lake County, Utah, is a Humane World member and was first introduced to walking horses in 1964. He owned several and began showing horses in 1984. Mr. Coon owned a horse which, without Mr. Coon's knowledge, was sored by a trainer seeking a competitive advantage. Mr. Coon later learned his horse won a show only after the trainer had sored the horse. Mr. Coon became aware of the soring when he stopped by the stable unannounced and found his horse in agony. Mr. Coon does not show his horses because of the unfair competition resulting from widespread soring in the walking horse show industry, and does not want to support the cruelty he himself witnessed by entering shows. As a result, he is excluded from participating in the most lucrative segment of the walking horse show market, limiting his ability to compete, exhibit, and realize the economic and reputational benefits associated with showing.

28. Among other forms of abuse, Mr. Coon observed a sored walking horse being trained by torture not to respond to painful palpation (a practice called "stewarding") during practice inspections—every time the horse reacted, he was beaten with a golf club. Mr. Coon is also a board member and former judge at FOSH shows. Through FOSH, he has strongly advocated against soring and supported the development of sound horse competition, foregoing financial opportunities resulting from showing walking horses in the more lucrative shows. Defendants'

decisions allow soring violations to go unenforced, causing plaintiff injury that would be remedied if those decisions were set aside.

29. Plaintiff Fran Cole, a resident of Dane County, Wisconsin, is a Humane World member and has owned, exhibited, and bred walking horses for many years. Ms. Cole purchased her first walking horse in 1999. She has held leadership positions in walking horse breeders' associations, including the Tennessee Walking Horse Breeders and Exhibitors Association (TWHBEA) and the Northern California Walking Horse Association. Ms. Cole manages and exhibits horses at sound horse shows, but does not participate in some of the larger more prominent walking horse shows because of the rampant soring that takes place in that segment of the industry, and Ms. Cole's knowledge that soring causes harm to the sored horses and unfair competition for sound horses. Accordingly, her ability to realize the full economic and reputational benefits of showing her horses is significantly limited.

30. Ms. Cole used to breed walking horses but does not do so anymore because of the stigma associated with the walking horse industry and soring, resulting in lost income and business opportunities. Because of Ms. Cole's anti-soring advocacy, she is no longer able to be a member of TWHBEA. Without being a member, she is unable to view horses' breeding lines, or show results, limiting her ability to breed, market, and sell walking horses. Because of the stigma associated with walking horses, Ms. Cole has also suffered personal attacks against her from people who assume that, because she owns walking horses, she must be involved in soring. This stigma, and the resulting abuse, is perpetuated by ongoing soring throughout this segment of the show industry and significantly exacerbated by USDA's failure to properly administer or enforce the HPA. Defendants' decisions cause plaintiff Cole injury that would be remedied if those decisions were set aside.

31. Plaintiff Jacqueline Kasselman, a resident of Pueblo County, Colorado, had horses as a child on her family's farm and in 2017, after her children had all grown up, decided to enter back into horse ownership. She is also a Humane World member. Through training her rescue horse, a Missouri Fox Trotter, she learned about Tennessee Walking Horses and decided to purchase one, named Trip, in March of 2022. Ms. Kasselman bought Trip for her granddaughter to ride and spent thousands training, advertising, and caring for him in order to participate adequately in big shows like the Tennessee Walking Horse National Celebration in Shelbyville, Tennessee (Celebration). Ms. Kasselman was assured by her trainer and other industry participants that soring was not occurring at Tennessee Walking Horse shows. Yet, she grew suspicious of those representations when her trainer refused to use Ms. Kasselman's personal veterinarian and farrier, instead insisting that they use a different local veterinarian and a farrier flown in from Tennessee. Ms. Kasselman and her granddaughter were told not to attend inspections of Trip, instead only observing from a distance. In less than two years, Ms. Kasselman pulled Trip from showing at the Tennessee Walking Horse shows after she discovered that Trip was sored, and she was a victim of the industry's deceptive conduct.

32. Ms. Kasselman has since invested considerable time and money in Trip's rehabilitation. Despite that rehabilitation, and significant time trying to teach Trip that he can trust humans, Ms. Kasselman has been unable to confidently ride Trip. The lack of enforcement by the Agency, and its continued abandonment of its obligations, are directly responsible for the physical, psychological, and monetary harm experienced by Ms. Kasselman and Trip. Accordingly, Ms. Kasselman's ability to show Trip in Tennessee Walking Horse shows in the future, and realize the full economic and reputational benefits of her investment, is significantly limited. Defendants' decisions cause plaintiff Kasselman injury that would be remedied if those decisions were set aside.

33. Defendant USDA is a federal governmental agency within the meaning of 5 U.S.C. § 552(f)(1), and is entrusted with enforcement of the HPA and the promulgation of rules and regulations thereto.

34. Defendant APHIS is a federal governmental agency within the meaning of 5 U.S.C. § 552(f)(1), and is tasked by USDA with HPA enforcement and administration. USDA is the parent agency of APHIS.

35. Defendant Brooke Rollins is the United States Secretary of Agriculture, and has ultimate responsibility for decisions made by USDA and APHIS, as an office within her Department. Plaintiffs sue Secretary Rollins in her official capacity.

36. Defendant Kelly Moore is the Acting Administrator of APHIS, and oversees administration of the HPA. Plaintiffs sue Administrator Moore in her official capacity.

## JURISDICTION AND VENUE

37. This action arises under the APA, 5 U.S.C. §§ 551, 553, 701-706, and the HPA, 15 U.S.C. § 1821 *et seq*. The Court has subject matter jurisdiction pursuant to these provisions and 28 U.S.C. § 1331.

38. This Court has the authority to issue the requested declaratory and statutory relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 702-706.

39. Venue is proper in this Court under 28 U.S.C. § 1391(e). This action is brought against an officer and agency of the United States, and Defendants maintain offices in the District of Columbia. Venue is also proper under 28 U.S.C. §§ 1391(b)-(c) because plaintiffs Humane World and the Action Fund reside in and have their principal places of business in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this judicial district.

40. This case is related to a case filed in this Court in 2019 by some of the plaintiffs here. In that case, the plaintiffs challenged the USDA's decision to constructively withdraw, by pulling from publication and indefinitely suspending—without notice and comment—a final rule promulgated pursuant to the HPA that also would have, among other things, replaced the failed industry self-policing system. The D.C. Circuit ruled that the withdrawal was unlawful. *See Humane Soc'y of the United States,* 41 F.4th at 568. Following that ruling, the district court remanded the matter to the Agency with instructions to either implement the final rule at issue or promulgate a new rule pursuant to the Agency's assertion that it was preparing to do so. *Humane Soc'y of the United States v. United States Dep't of Agric.*, No. 19-CV-2458 (BAH), 2023 WL 3433970, at *14 (D.D.C. May 12, 2023) ("USDA's unlawful withdrawal of the 2017 Anti-Soring Enforcement Rule is remanded without vacatur, but vacatur will automatically occur after 120 days if the agency fails to take appropriate remedial action."). Subsequently, the Agency did promulgate a new rule—i.e., the 2024 Final Rule at issue here. 89 Fed. Reg. 39194.

## STATUTORY FRAMEWORK

### The Horse Protection Act

41. The HPA provides, *inter alia*, that "[t]he following conduct is prohibited:"

> **(1)** The shipping, transporting, moving, delivering, or receiving of any horse which is sore with reason to believe that such horse while it is sore may be shown, exhibited, entered for the purpose of being shown or exhibited, sold, auctioned, or offered for sale, in any horse show, horse exhibition, or horse sale or auction; except that this paragraph does not apply to the shipping, transporting, moving, delivering, or receiving of any horse by a common or contract carrier or an employee thereof in the usual course of the carrier's business or employee's employment unless the carrier or employee has reason to believe that such horse is sore.
> **(2)** The (A) showing or exhibiting, in any horse show or horse exhibition, of any horse which is sore, (B) entering for the purpose of showing or exhibiting in any horse show or horse exhibition, any horse which is sore, (C) selling, auctioning, or offering for sale, in any horse sale or auction, any horse which is sore, and (D) allowing any activity described in clause (A), (B), or (C) respecting a horse which is sore by the owner of such horse.

> **(3)** The failure by the management of any horse show or horse exhibition, which does not appoint and retain a person in accordance with section 1823(c) of this title, to disqualify from being shown or exhibited any horse which is sore.
> **(4)** The failure by the management of any horse sale or auction, which does not appoint and retain a qualified person in accordance with section 1823(c) of this title, to prohibit the sale, offering for sale, or auction of any horse which is sore.
> **(5)** The failure by the management of any horse show or horse exhibition, which has appointed and retained a person in accordance with section 1823(c) of this title, to disqualify from being shown or exhibited any horse (A) which is sore, and (B) after having been notified by such person or the Secretary that the horse is sore or after otherwise having knowledge that the horse is sore.
> . . .

15 U.S.C. § 1824 (Unlawful Acts).

42. The HPA defines the term "sore" to include any horse which suffers physical pain or distress when moving as result of (a) the application of an irritating or blistering agent, (b) the infliction of a burn, cut, or laceration, (c) the injection of a tack, nail, screw, or chemical agent, or (d) any other substance or device used by a person on any limb of the horse. *Id.* § 1821(3).

43. The HPA delegates broad authority to the USDA to "issue rules and regulations . . . necessary to carry out the provisions of [the HPA]." *Id.* § 1828.

44. Furthermore, Section 1823(e) gives the Agency authority to perform inspections at horse shows, and 1823(a) states that horses shall be "disqualif[ied] . . . from being shown or exhibited" if (1) they are sore or (2) "management [of any horse show or horse exhibition] has been notified by a [qualified inspector] or by the Secretary that the horse is sore." *Id.* § 1823.

**The Administrative Procedure Act**

45. The APA defines "agency action" to include "the whole or part of an agency rule," 5 U.S.C. § 551(13), and defines "rule," in turn, as the "whole or part of an agency statement of general or particular applicability and future effect designed to implement . . . law or policy." *Id.* § 551(4).

46. "[R]ule making" is the "process [of] formulating, amending, or repealing a rule." *Id.* § 551(5), and APA Section 553 mandates procedural requirements for rulemaking. It typically requires that a "[g]eneral notice of proposed rulemaking shall be published in the Federal Register" *Id.* § 553(b), and "[a]fter notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments . . . ." *Id.* § 553(c).

47. Even an agency decision to temporarily suspend a rule or delay implementation of a rule must adhere to the notice and comment requirements, barring exceptional circumstances. As the D.C. Circuit stated in *Clean Air Council v. Pruitt*, 862 F.3d 1 (D.C. Cir. 2017), "[a]gencies obviously have broad discretion to reconsider a regulation at any time. To do so, however, they must comply with the Administrative Procedure Act (APA), including its requirements for notice and comment. . . . As we have explained, 'an agency issuing a legislative rule is itself bound by the rule until that rule is amended or revoked' and 'may not alter [such a rule] without notice and comment.'" *Id.* at 8-9 (internal citations omitted).

48. The APA provides for judicial review of any "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. It also establishes that, "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." *Id.* § 702.

49. The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). An agency action is arbitrary and capricious if the agency's analysis is internally inconsistent or inadequately explained, or if it diverges from prior policies and standards without providing a reasoned explanation for why the agency changed course. *See F.C.C. v. Fox Television Stations, Inc.,* 556 U.S. 502, 515-516 (2009).

## FACTUAL BACKGROUND

### The Walking Horse Industry and the Cruel and Inhumane Practice of Horse Soring

50. The Tennessee Walking Horse was originally bred to provide a more comfortable ride to Southern plantation owners who spent hours on horseback. As these farmers gradually turned to motor vehicles, breed owners sought to preserve the walking horse by forming a national association and by organizing horse shows. At the time, and when breed-specific competition later developed, horse shows were more limited in scale and had not yet evolved into the large, commercial enterprises that exist today.

51. In the earliest shows, walking horses were honored to the extent they exemplified the steady, relaxed gait said to be natural to the breed. But by the late 1940s, some trainers began experimenting with techniques, emphasizing increased motion and speed, with the additional objective of lifting the horse's head and front limbs and feet further from the ground. The result was a unique running-walk with a dramatic, high-prancing action of the front limbs, dubbed the "Big Lick." While horses naturally place as much as 65 percent of their body weight on the front limbs, the Big Lick could be achieved only by reversing this distribution, creating the appearance of the horse walking more on its hind legs. Big Lick Tennessee Walking Horse competitions are mostly found in the American South, including Tennessee, Kentucky, Alabama, Mississippi, Georgia, North Carolina, and South Carolina, and to a lesser extent, Florida, Texas, Missouri, Virginia, and Louisiana. The largest of these shows, the Tennessee Walking Horse National Celebration in Shelbyville, Tennessee, has been held annually since 1939, and the scale and commercial significance of such shows has increased substantially since that time and since enactment of the HPA.

52. In the 1950s, trainers created the Big Lick gait by "soring" the front feet of the horse—i.e., intentionally inflicting pain on the horse's limbs to induce the desired gait. If the front

feet are painful (sore), the horse will lift them quickly from the ground and shift their weight to the hind legs to avoid putting weight on the front limbs. Several methods are commonly used to sore horses, including chemical irritants, painful objects placed under the hooves, and the use of devices that cause or exacerbate pain with movement. The evidence of soring can be concealed from inspectors through the use of additional chemicals that eliminate or mask pain responses and scars: wraps, hoof pads, and boots that conceal injury or objects; the administration of drugs or other medication which reduce the horses' pain response during inspection; and a cruel practice known as "stewarding," whereby trainers condition horses through physical abuse not to react to pain associated with physical inspection.

53. A June 1956 article in Sports Illustrated magazine entitled "Woe for Walkers" was among the first to highlight the "torture" and "disgraceful cruelty" of horse soring, which in some cases was so painful that horses were "too sore to get up." Alice Higgins, *Woe for Walkers*, Sports Illustrated, Jul. 22, 1956. In the years after this article, animal welfare groups and other news articles raised the alarm about horse soring. Despite attempts by some to curb soring, however, the practice continued unabated. In 1965, U.S. Senator Joseph Tydings began advocating for the passage of a federal law to end horse soring.

**The Horse Protection Act Is Passed with the Goal to End Horse Soring**

54. Congress passed the Horse Protection Act of 1970, followed by the Horse Protection Act Amendments of 1976 (together, the HPA, codified at 15 U.S.C. § 1821 *et seq.*), to end horse soring.[2] As quoted above, the HPA prohibits exhibiting or selling sore horses, or

[2] "The Horse Protection Act was adopted to further two public purposes: the altruistic one of protecting the animals from an unnecessary and cruel practice and the economic one of eliminating unfair competition from sored pseudo-champions that could fatally damage the Tennessee walking horse industry. [ . . . ] The Act was intended to 'make it impossible for persons to show sored horses.'" *Thornton v. U.S. Dep't of Agric.,* 715 F.2d 1508, 1511 (11th Cir. 1983) (citing Horse Protection Act Amendments of 1976, H.R. Rep. No. 1174, 94th Cong., 2d Sess. 4, *reprinted in*

transporting sore horses with reason to believe that the horse may be sold, shown, or exhibited. 15 U.S.C. § 1824(1)-(2). The HPA also requires the management of horse shows and exhibitions to disqualify any horse that is sore. *Id.* § 1823(a). Criminal penalties apply to knowing violations of the HPA. *Id.* § 1825(a).

55. As noted above, the HPA defines the term "sore" to include any horse which suffers physical pain or distress when moving as result of (a) the application of an irritating or blistering agent, (b) the infliction of a burn, cut, or laceration, (c) the injection of a tack, nail, screw, or chemical agent, or (d) any other substance or device used by a person on any limb of the horse. *Id.* § 1821(3).

56. In adopting the HPA, Congress declared that the practice of soring horses for the purposes of affecting their natural gait is "cruel and inhumane." *Id.* § 1822(1). Congress further found that horses which are sored "compete unfairly" with horses which are not sore. *Id*. § 1822(2). Moreover, according to the 1970 Senate Report from the Senate Commerce Committee regarding the legislation, "persons who refuse to sore their horses have been faced with a difficult dilemma: either they must forgo most opportunities to compete successfully in horse shows, or they must devote their attentions to a different breed of horse." S. Rep. No. 91-609, at 2 (1969).

57. The HPA as enacted in 1970, however, failed to prevent the showing of sore horses or to eliminate the incentives that led owners and trainers to sore their horses. S. Rep. No. 93-1282, at 2 (1974). In fact, a Senate committee found "overwhelming evidence that soring continued to be widely practiced after the passage of the Horse Protection Act." *Id.*

---

1976 U.S. Code Cong. & Admin. News 1696, 1699; and Horse Protection Act of 1970, H.R. Rep. No. 1597, 91st Cong., 2d Sess., *reprinted in* 1970 U.S. Code Cong. & Admin. News 4870, 4872).

58. Alarmed by the lack of enforcement, Congress passed the Horse Protection Act Amendments of 1976. The Amendments directed the USDA to create new regulations mandating that inspectors be present at horse shows, exhibitions, and auctions to assess whether horses are sore, *see* 15 U.S.C. § 1823(c), and authorized the Secretary or its representative to inspect horses and records at horse shows "for purposes of enforcement" of the HPA. *See id.* § at 1823(e).

59. The amended law required horse show and exhibition management to disqualify any horse identified as sore by an inspector or a representative of the USDA. *Id.* § 1823(a).

**HPA Regulatory History and HPA Regulations**

60. The USDA delegated its authority under the HPA to APHIS, and in 1972, APHIS promulgated the first regulations pursuant to the Horse Protection Act of 1970. Horse Protection Regulations, 37 Fed. Reg. 2426 (Feb. 1, 1972). The first HPA regulations prohibited certain "action devices" (boots, chains, pads, rollers, or other devices which operate by rotating around or moving up and down the leg of the horse, causing friction or striking the hoof, coronet band, or fetlock joint). *Id.* at 2428. The regulations also required that show management either disqualify sored horses themselves or appoint a USDA-accredited veterinarian to inspect horses and report violations to show management, which in turn must disqualify sored horses and report violations to APHIS. *Id.* at 2428. The new regulations were immediately met with open hostility and even aggression at local shows. In 1972, for example, the USDA had to send three U.S. Marshals to protect its inspectors after 35 of the 105 entrants were disqualified at the National Celebration. *U.S. Marshals Sent to Big Horse Show,* N.Y. Times (Aug. 30, 1972), https://www.nytimes.com/1972/08/30/archives/us-marshals-sent-to-big-horse-show.html?smid=url-share. The disqualifications prompted angry trainers to storm into the show ring, forcing the cancellation of the day's remaining events.

61. APHIS revised its regulations in 1975 to address complaints from the regulated horse industry that the then-existing regulations were unnecessarily restrictive. Devices and Substances for Use on Horses at Certain Horse Shows, 40 Fed. Reg. 36553 (Aug. 21, 1975). Only one year later, however, Congress amended the HPA to reinforce its mandate to eliminate horse soring. Following these amendments, APHIS was required to, and did, promulgate new regulations. *See* Definition of Terms and Certification and Licensing of Designate Qualified Persons, 44 Fed. Reg. 1558 (Jan. 5, 1979); Horse Protection Final Rule, 44 Fed. Reg. 25172 (Apr. 27, 1979). These regulations, as amended in 1988 and 1989, are largely in place today.

62. Among other things, the 1979 regulations included the original "Scar Rule," which the agency promulgated to facilitate the identification of horses that have been subjected to prohibited soring. *See* 44 Fed. Reg. at 25180. The Rule was later amended to its current form in 1988. *See* Horse Protection Regulations, 53 Fed. Reg. 14778 (Apr. 26, 1988) (codified at 9 C.F.R. § 11.3). The Rule provides that if a horse's pasterns do not meet certain criteria, the horse will be considered sore. Those criteria include that "[t]he anterior and anterior-lateral surfaces of the fore pasterns (extensor surface) must be free of bilateral granulomas, other bilateral pathological evidence of inflammation, and other bilateral evidence of abuse indicative of soring including, but not limited to, excessive loss of hair." 9 C.F.R. § 11.3(a).

63. The Scar Rule's terms are consistent with the language and intent of the HPA, which states in the penalty provisions that "a horse shall be presumed to be a horse which is sore if it manifests abnormal sensitivity or inflammation in both of its forelimbs or both of its hindlimbs." 15 U.S.C. § 1825(d)(5)*; see also* Horse Protection Regulations, 43 Fed. Reg. 18514, 18519 (Apr. 28, 1978) (discussing reasoning for the rule and noting that "[t]he chances are extremely remote that any horse would ever injure both forelegs in an identical manner with resulting identical scars in the anterior or posterior pastern area of each foreleg."). The pathological

indicators described in the Scar Rule correspond directly with the definition of sore and prohibited practices in the HPA.

64. The Scar Rule was and still is extremely important for purposes of carrying out the mandate of the HPA by providing an objective, evidentiary framework for identifying horses that meet the statutory definition of "sore," because trainers and others who sore horses have learned ways of evading detection through physical examination—including the use of lethargy-inducing drugs and cruelly "stewarding" a horse not to react to painful palpation and other aspects of examination. The Scar Rule allows for the use of objective visual evidence consistent with soring to find a violation.

65. The 1979 regulations also created an inspection and enforcement system administered by financially invested industry groups called Horse Industry Organizations, or HIOs. *See* 9 C.F.R. § 11.1 (HIO "means an organized group of people, having a formal structure, who are engaged in the promotion of horses through the showing, exhibiting, sale, auction, registry, or any activity which contributed to the advancement of the horse."). Since that time, the scale and commercial significance of these activities has increased, as have the economic incentives associated with HIO-administered events.

66. HIOs are "certified" by APHIS to administer a Designated Qualified Persons (DQPs) training and licensing program. *Id.* § 11.7. Any licensed DQP can then be hired by management of a horse show "to detect or diagnose horses which are sore or to otherwise inspect horses and any records pertaining to such horses for the purposes of enforcing the Act." *Id.* § 11.1; *see also id.* § 11.7(a).

67. Horse show management may appoint and retain DQPs from any HIO with a certified DQP program. If a DQP finds a "violation," the DQP "shall immediately report [it] to the management of any horse show, horse exhibition, or horse sale or auction." *Id.* § 11.20(b)(3). If

such report is received by management before that horse has been shown, exhibited, sold or auctioned, then management "shall immediately disqualify or disallow" that horse. *Id.* § 11.20(b)(1).

68. The regulations also outline protocols regarding inspections conducted by Agency representatives at shows. *Id.* § 11.4. Pursuant to the language of the HPA, if an agency inspector finds a horse to be sore and notifies show management of the finding, management shall disqualify the horse from showing. 15 U.S.C. § 1823(a).

69. On September 30, 2010, the USDA's Office of Inspector General (OIG) published the results of a two-year investigation of soring in walking horse shows that focused on the inadequacies of the HIO-administered scheme. *See* APHIS, *Administration of the Horse Protection Program and the Slaughter Horse Transport Program* (2010), https://www.regulations.gov/document/APHIS-2022-0004-0002 ("Audit Report").

70. According to the Audit Report, "OIG and APHIS have together reached the conclusion that the system of inspections based on DQPs is not working to accomplish the goals of the law . . . ." *Id.* at 10.

71. The Audit Report concluded that the inadequacy of the HIO-administered enforcement scheme with licensed DQP inspectors stems from an "inherent" and "direct" conflict of interest. *Id.* at 10-11. First, because DQPs are "primarily hired from show industry participants . . . they are reluctant to issue violations since excluding horses from the show inconveniences their employers, and makes it less likely they will be hired for other shows." *Id.* at 10. Second, "while they are acting as a DQP at one show, they may be an exhibitor at another show, and the exhibitor of the horse they are examining might later act as the DQP." *Id.* Under the system, "the horse show management gets the best of both worlds"—limited liability with regard to the HPA, and an ineffective inspection and enforcement scheme that rarely finds or eliminates horses that

have been sored from their show, thereby allowing sored horses to continue competing in violation of the HPA. *Id.* at 11.

72. As part of its investigation, between August 2008 and August 2009, OIG sent auditors to observe horse shows in multiple states. *Id.* at 35. Auditors interviewed APHIS personnel, reviewed horse show reports, monitored actual inspections, and found numerous examples of deficient inspections by DQPs. *Id.* at 12-13. Not only were the inspections themselves flawed, but when a violation was found and a ticket (citation for a violation) produced, exhibitors frequently sent their children, friends, and employees to accept the tickets so that the exhibitors could avoid penalties entirely, allowing them to continue competing in violation of the HPA. *Id.* at 13.

73. APHIS agreed with the Audit Report's recommendations and proposed to "abolish the current DQP licensing system," turning over licensing to APHIS officials. *Id.* at 18. APHIS also agreed to establish "strict qualification and criteria to prohibit conflicts of interest." *Id.*

74. Prior to the release of the Audit, the Agency already knew that it had to make changes in its regulatory and enforcement scheme to address the utter lack of accountability in the industry, and the failure of the HPA to achieve its horse protection goals. Accordingly, in 2009 and 2010, the Agency issued a series of guidance documents to the industry, including, in early 2010, a document entitled "USDA Horse Protection Program 2010 Points of Emphasis."[3] In keeping with the letter and mandate of the HPA to prohibit sore horses from being shown, 15

---

[3] The 2010 Points of Emphasis is not available on the USDA's website, but it is available as an attachment to the WHOA-HIO's 2013 Rulebook. Walking Horse Owners Association – Horse Industry Organization, *WHOA-HIO Rulebook* (2013), https://nebula.wsimg.com/28888135b39bb330d16fdea1b20495fa?AccessKeyId=026BF9C6D3A4AB0FDC97&disposition=0&alloworigin=1 (Attachment 2, provision entitled "Dismissal from Show, Exhibition, Sale or Auction").

U.S.C. § 1824, the 2010 Points of Emphasis included a provision stating that HIOs were required to disqualify a horse found to be sore from participating in the remainder of a show. This guidance came to be known as the "No Showback Rule."

75. In 2012, APHIS concluded that "over 30 years of industry self-regulation through the DQP program has failed to eliminate the cruel and inhumane practice of soring . . . ." Requiring Horse Industry Organizations to Assess and Enforce Minimum Penalties for Violations, 77 Fed. Reg. 33607, 33609 (June 7, 2012).

**The 2017 Final Rule**

76. To address the complete failure of industry self-policing, USDA announced a Final Rule on January 11, 2017 to "strengthen enforcement of the HPA and regulations, and help to protect horses from the cruel and inhumane practice of soring and eliminate the unfair competitive advantage that sore horses have over horses that are not sore." APHIS, *Horse Protection; Licensing of Designated Qualified Persons and Other Amendments*, at 5 (Jan. 11, 2017), https://www.regulations.gov/document/APHIS-2011-0009-11191 (Final Rule available as a Word document) (2017 Rule).

77. The 2017 Rule finally abolished the HIO-administered enforcement scheme. The replacement included independent inspectors who are veterinarians or veterinary technicians and trained, licensed, and monitored by APHIS. In support of this decision, the Agency:

- Cited the Audit Report's conclusion that the DQP program "is not adequate to effectively enforce the Act and regulations." *Id.* at 4.
- Concluded that evidence from the Audit Report "clearly demonstrates" a conflict of interest and the "ineffectiveness of the resulting system." *Id.* at 66.
- Concluded that the Audit Report's recommendation was consistent with the findings of USDA's Office of the Judicial Officer, which issues final decisions on behalf of the Secretary of Agriculture for purposes of judicial review. *Id.* at 4. The Secretary, through the Judicial Officer, "has routinely found that inspections of horses conducted by [DQPs] are less probative than inspections conducted by USDA Veterinary Medical

> Officers (VMOs). In making such findings, the Secretary has noted that DQPs often conduct 'short and cursory' inspections . . . that DQPs are not veterinarians and do not maintain the same qualifications, and that DQPs must engage with members of the industry on a daily basis, which may make them reluctant to notify management that a horse is sore." *Id.*

78. The 2017 Rule also prohibited the use of any action device on a Tennessee Walking Horse or racking horse, including chains under six ounces (which were previously allowed), as well as all pads and wedges (with exceptions for certain protective and therapeutic devices). *Id.* at 124, 126.

79. On or around Monday, January 16, 2017, USDA transmitted the Final Rule to OFR, which posted the Final Rule for "public inspection" on Thursday, January 19, 2017, and assigned a publication date of Tuesday, January 24, 2017. However, before the Rule was published, a new administration took office and the President's Chief of Staff directed agencies to "immediately withdraw" any regulations that had been sent to Office of Federal Register (OFR) but not yet published, including the long-awaited 2017 Rule. Accordingly, APHIS directed OFR to prevent the 2017 Rule from being published, and the Rule was put indefinitely on hold and not implemented.

80. Following efforts by Humane World, the Action Fund, other organizations, and a bipartisan coalition of legislators to engage the Agency and ensure implementation of the critical 2017 Rule, Humane World, the Action Fund, and several of the individual plaintiffs here sued the Agency for unlawfully withdrawing a final rule without proper notice and comment, and without otherwise adhering to the requirements of the Administrative Procedure Act. *See* Compl. for Declaratory and Injunctive Relief, *Humane Society of the United States, et al. v. United States Dep't of Agric., et al.,* 19-cv-02458-BAH (August 13, 2019).

81. The district court granted the Agency's motion to dismiss, finding that the rule was not final for purposes of requiring notice and comment prior to withdrawal, because it had not been

published in the Federal Register. *Humane Soc'y of the U.S. v. U.S. Dep't of Agric*., 474 F. Supp. 3d 320 (D.D.C. 2020). Subsequently, on appeal, the D.C. Circuit reversed and held that the rule became final once it was provided for public inspection to OFR and thus could not be abandoned without formal notice and comment procedures. *Humane Soc'y of the U.S.,* 41 F.4th 564. The Court of Appeals remanded to the District Court to craft a remedy consistent with its ruling.

**Remand to the Agency and the 2024 Final Rule**

82. The district court remanded the matter to the Agency. *Humane Soc'y of the United States v. United States Dep't of Agric.*, No. 19-cv-02458 (BAH), 2023 WL 3433970, at *14 (D.D.C. May 12, 2023) ("[T]he Court will remand without vacatur, but the 2017 Anti-Soring Enforcement Rule will take automatic effect after 120 days if the agency fails to take appropriate remedial action."). Subsequently, the Agency formally withdrew the 2017 Rule following notice and comment procedures, with the promise of proposing and promulgating a new rule that would adhere to many of the same goals and principles as the 2017 rule, with updates. *See* Horse Protection; Licensing of Designated Qualified Persons and Other Amendments; Withdrawal, 88 Fed. Reg. 74336 (Oct. 31, 2023) ("APHIS is withdrawing the 2017 HPA final rule."). Among other things, the Agency wanted to address and incorporate recommendations made by the National Academy of Sciences, Engineering, and Medicine in a report published in 2021. *See A Review of Methods for Detecting Soreness in Horses*, Nat'l Acad. of Scis., Eng'g & Med. (2021), https://doi.org/10.17226/25949 ("NAS Report").

83. Humane World, the Action Fund, and many others did not strongly oppose this withdrawal—despite it being unnecessary and further delaying the Agency's obligations under the HPA—because of the Agency's commitment to promulgate a new rule quickly.

84. The Agency then proposed a new rule to replace the 2017 rule, *see* Horse Protection, 88 Fed. Reg. 56924 (Aug. 21, 2023), which it later finalized following public comment, *see* 89 Fed. Reg. 39194. This final rule again eliminated the use of industry-trained DQPs to conduct inspections at horse shows and replaced them with APHIS-trained "Horse Protection Inspectors" (HPIs).

85. In issuing the 2024 Final Rule, the Agency gathered and reiterated evidence demonstrating without any doubt that the DQP/HIO program with industry in charge of the vast majority of the enforcement under the HPA, was completely ineffective to achieve the goals of the statute, and therefore, the system needed to be replaced for the agency to fulfill its mandate under the HPA. *See id.* at 39195-39196.

86. For example, the Agency cited the NAS Report, which found "numerous instances of inadequate performance by DQPs." *Id.* at 39196 ("[A] review of 61 inspection videos provided by APHIS and by HIOs […] revealed numerous instances of inadequate performance by DQPs … the NAS committee strongly recommended that the use of DQPs for inspections under the current regulations be discontinued and that only veterinarians, preferably with equine experience, be allowed to examine horses . . . .").

87. The Agency also referenced the 2010 OIG report which "concluded that the inspection program, in which the horse industry trains and licenses DQPs to inspect horses under APHIS' oversight, is ineffective in ensuring that horses are not sore upon inspection as required under the Act." *Id.* at 39195.

88. In addition, the Agency explained that its own autonomous analysis clearly showed that DQPs were consistently finding fewer violations than APHIS veterinary medical officers, stating:

> These evaluations, which were, again, external to APHIS, also correspond to evaluations of program efficacy that APHIS conducts as part of ongoing evaluation of its Horse Protection program. Inspection data compiled by APHIS from fiscal years (FY) 2017 to 2022 demonstrated that inconsistencies persisted in the number of violations detected by APHIS officials and those issued by DQPs inspecting horses. During this period, APHIS attended about 16 percent of all HPA-covered events featuring Tennessee Walking Horses, racking horses, and other breeds at which horse industry DQPs conducted inspections. These inspections were conducted on horses competing in the Performance ("padded") division as well as the flat-shod division. *While APHIS attended only a fraction of the events at which DQPs were appointed to inspect horses, APHIS consistently reported much higher rates of noncompliance at these events based on its VMO inspection findings when compared to DQP findings.*

*Id.* at 39196 (emphasis added). The 2024 Final Rule also prohibited certain action devices that are widely known to be used in soring, and adjusted the Scar Rule to respond to the NAS Report (renamed the "dermatologic conditions indicative of soring" or "DCIS" Rule). *Id.* at 39221-39224.

89. The robust administrative record compiled in support of the 2024 Final Rule, which includes the record in support of the 2017 Final Rule, makes clear that regulatory enforcement, and the 2024 Final Rule's elimination of industry self-policing, are necessary to accomplish Congress' purposes and directives in the HPA. It is unclear how the Agency could justify abandonment of these regulatory measures. But the difficulty of following proper procedures and working around such a compelling administrative record certainly does not justify sidestepping the administrative process altogether, and abandoning deliberately and formally promulgated regulations by dereliction and desertion.

90. Plaintiffs were pleased with the 2024 Final Rule and were hopeful that at long last the Agency was taking its obligations under the HPA seriously.

91. Some industry players affected by the regulations, however, were less pleased, and filed a lawsuit challenging the 2024 Final Rule (peculiarly, in the Northern District of Texas). *See* Compl., *Tennessee Walking Horse Nat'l Celebration Assn, et al. v. United States Dep't of Agric., et al.*, No. 2:24-cv-00143-Z (N.D. Tex., July 1, 2024).

92. The 2024 Final Rule was set to take full effect on February 1, 2025. However, on January 24, 2025, the new Administration issued a notice postponing implementation of the rule 60 days, to April 2, 2025. *See* USDA: APHIS, *HPA Final Rule Postponement* (Jan. 24, 2025), https://www.aphis.usda.gov/news/program-update/hpa-final-rule-postponement-1-24-2025.

93. Subsequently, on January 31, 2025, the N.D. Texas district court struck certain key aspects of the 2024 Final Rule, including the prohibitions on action devices and substances, the new "dermatologic conditions indicative of soring" rule that was intended to replace the Scar Rule, and the process for disqualifying horses found to be sore. *See Tennessee Walking Horse Nat'l Celebration Ass'n v. United States Dep't of Agric.*, 765 F. Supp. 3d 534, 552 (N.D. Tex. 2025).

94. *The district court upheld, however*, that part of the 2024 Final Rule that replaced the failed HIO/DQP system of industry self-enforcement and mandated the creation of APHIS-trained HPIs. *See id.* at 547-549 (finding the HPI rule within the Agency's statutory authority and also "supported by the record and a rational connection to the facts found. Implementing the HPI program was a reasoned response to the ongoing problem of industry appointed DQPs allowing sore horses to show.").

95. Following the Northern District of Texas's ruling, on March 21, 2025, the Agency issued a notice again postponing implementation of the portions of the rule that the court upheld. *See* Horse Protection Amendments; Further Delay of Effective Date, and Request for Comment, 90 Fed. Reg. 13273 (Mar. 21, 2025).

96. Humane World and the Action Fund submitted comments to APHIS noting that implementation of the regulations is necessary, and urging the Agency to do so promptly, since the horses have already waited so long for the promise of the HPA to be realized.

### *Gould* Litigation and the Agency's Suspension of Regulations

97. Meanwhile, in June 2025, individual owners of Tennessee Walking Horses and The Tennessee Walking Horse Celebration Association filed a lawsuit challenging various aspects of the *pre-2024 rules*, including the Scar Rule, the No Showback Rule, and the process associated with the disqualification of horses found to be sore. Compl., *Gould, et al. v. United States Dep't of Agric., et al.*, No. 2:25-cv-00147-Z (N.D. Tex., June 30, 2025). They filed in the same court in Texas that struck down aspects of the 2024 Final Rule.

98. The plaintiffs in the *Gould* case moved for a preliminary injunction, and on August 19, 2025, the district court granted the motion, enjoining application of the Scar Rule, the No Showback Rule, and the challenged disqualification procedures, *but only "to the extent necessary to provide complete relief to each named plaintiff." See Gould, et al. v. United States Dep't of Agric., et al.*, No. 2:25-cv-00147-Z, 2025 WL 2402083, at *8 (N.D. Tex. Aug. 19, 2025) (emphasis added), citing *Trump v. Casa, Inc.*, 145 S. Ct. 2540, 2560 (2025) ("[F]ederal courts lack authority to issue [universal injunctions].").

99. Despite the fact that the district court, consistent with new Supreme Court precedent, *explicitly limited the application of its preliminary injunction to the plaintiffs in that case*, on August 29, 2025, the Agency nevertheless announced its *sua sponte* decision to indefinitely withdraw application of the Scar Rule and the No Showback Rule *nationwide at all shows to all participants*. *See* Email from Louis DiVincenti, Acting Dir. Animal Welfare Operations, APHIS, *Horse Protection Program Update*, (Aug. 29, 2025, 10:30 am EST) (the contents of this announcement were posted by The Walking Horse Report, *Horse Protection Program Update*, Aug. 30, 2025, https://www.walkinghorsereport.com/news/Horse-Protection-Program-Update). The Agency also announced a decision that it "will not refer horses to DQPs or managers for disqualification until it updates its inspection process to provide horse custodians

with an opportunity to appeal APHIS' inspection findings." *Id*. Since this decision in August 2025, it appears that APHIS has done nothing to update its inspection process.

100. On January 28, 2026, the Agency further confirmed its decision to constructively withdraw the Scar Rule, No Showback Rule, and disqualification procedures for, at minimum, the duration of the 2026 show season. *See* Bernadette Juarez, *APHIS Shares Update on 2026 Horse Show Season* (Jan. 28, 2026), https://www.aphis.usda.gov/news/program-update/aphis-shares-update-2026-horse-show-season.

101. The Agency's decision was made without any notice and comment process, without any rational foundation, and in violation of the mandate of the HPA.

102. It would have been entirely possible—and consistent with the court's ruling in the *Gould* case and the agency's obligations under the HPA and APA—to continue applying these important rules and procedures to the vast majority of the walking horse industry, i.e. everyone other than the plaintiffs in the *Gould* case. Unfortunately, the Agency has chosen to unnecessarily abandon important and broadly applicable aspects of the regulatory scheme. No court order obligates the agency to do this. The Agency *has chosen* to allow soring violations rather than adhering to the requirements of the law.

103. Following the Agency's decision to constructively withdraw the Scar Rule, No Showback Rule, and disqualification process, there has been little to no enforcement of any kind at walking horse shows. Indeed, based on observations made by Humane World staff and others, it does not appear that APHIS has been conducting inspections at shows at all since it made these decisions.

104. On March 14, 2026, the Agency hosted an open house in Shelbyville, Tennessee, where Agency staff discussed how the Agency would function in the 2026 season. This meeting, which was recorded by the What A Horse organization and posted online, further confirms the

Agency's decision to suspend all enforcement. *See* What a Horse, *2026 USDA HPA Open House* (Mar. 16, 2026), https://www.youtube.com/watch?v=xu0jIrXfAfc. In fact, the Agency, through spokeswoman Bernadette Juarez, went as far as to say, "[s]o I return to you [stakeholders/HIOs] . . . the responsibility and obligation to figure out as an industry how you'll make sure that trainers, owners, exhibitors—everybody understands—that it's your responsibility to make sure that there isn't a sliding back in the condition of your horses because we won't enforce the Scar Rule and neither will the HIOs." *Id.* at 13:06. Ms. Juarez noted that despite already giving the industry five failed opportunities to get its act together, the Agency "hope[s] that [industry will] make the sixth time the charm" by giving them *yet another opportunity* to make self-policing of the HPA work. *Id.* at 27:45.

105. Soring continues to be widespread in the walking horse industry, and the horses continue to suffer, despite the promise and mandate of the HPA.

**Constructive Withdrawal of the 2024 Final Rule**

106. On January 28, 2026, to the dismay of Plaintiffs and detriment of the horses, the Agency issued a decision to again suspend implementation of the 2024 Final Rule, this time, allegedly, until December 31, 2026. Horse Protection Amendments; Further Postponement of Regulations, 91 Fed. Reg. 3633 (Jan. 28, 2026). The Agency contended in this decision document that it needed to suspend the Rule because it has been unable to train enough HPIs in time for the 2026 show season, and because of the ongoing litigation challenging the existing regulations, purportedly making training of HPIs difficult. *Id.* at 3635.

107. The Agency cannot justify abandoning the 2024 Final Rule while continuing to rely on the existing HIO-administered system, which does not reliably identify or disqualify sored horses and, as noted above, allows "the horse show management [to] get[] the best of both worlds"—limited liability under the HPA and an ineffective inspection and enforcement scheme

that rarely identifies sored horses or results in their disqualification, thereby allowing sored horses to continue competing in violation of the HPA. APHIS, *Audit Report* at 11. The 2024 Final Rule was intended to correct these deficiencies, and the training provision, 9 C.F.R. § 11.19, took effect on June 7, 2024, authorizing APHIS to begin screening and training HPIs. Delaying implementation of the Rule's provisions addressing industry self-policing allows continued reliance on a system that plainly fails to carry out the mandate of the HPA.

108. The Agency's decision to continuously abandon the 2024 Final Rule amounts to a constructive withdrawal, and was arbitrary, capricious, and contrary to requirements of the HPA.

## **FIRST CAUSE OF ACTION**

### **(Violation of the APA and HPA – Scar Rule)**

109. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

110. The Agency's August 29, 2025 and January 28, 2026 communications announced the Agency's decision to constructively withdraw the Scar Rule, 9 C.F.R. § 11.3, and constituted final agency action. *See* Email from Louis DiVincenti, *supra* para. 99, at 33; Juarez, *supra* para. 100, at 33-34.

111. The Agency's withdrawal of the Scar Rule was undertaken without compliance with the notice and comment provisions of the APA, 5 U.S.C. § 553, because the APA requires that agencies use the same procedures to amend or repeal rules as they used to issue the original rule. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015). Furthermore, the APA's arbitrary and capricious standard applies equally to rule promulgations and recissions. *See* 5 U.S.C. § 551(5); *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-44 (1983).

112. Because the Scar Rule was promulgated through notice and comment rulemaking, any repeal or amendment must also provide an opportunity for notice and comment. However, the Agency withdrew the Scar Rule without any formal notice of proposed withdrawal or opportunity for public comment.

113. Agencies must also provide a "reasoned explanation" for reversing their position. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-516 (2009). The Agency's decision to constructively withdraw the Scar Rule was made without any reasoned explanation.

114. The Agency's decision to constructively withdraw the Scar Rule is also inconsistent with the clear intent of Congress to end the cruel practice of horse soring.

115. Therefore, the Agency's withdrawal of the Scar Rule was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and was "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), 706(2)(D).

## <u>SECOND CAUSE OF ACTION</u>

**(Violation of the APA and HPA – No Showback Rule)**

116. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

117. The Agency's August 29, 2025 and January 28, 2026 communications announced the Agency's decision to withdraw the No Showback Rule, and constituted final agency action. *See* Email from Louis DiVincenti, *supra* para. 99, at 33; Juarez, *supra* para. 100, at 33-34. The Agency's action resulted in the reversal of legal, policy, and factual findings that led to the adoption of the No Showback Rule in 2010, without any reasoned explanation to support that reversal.

118. Agencies must provide a "reasoned explanation" for reversing their position. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-516 (2009).

119. The Agency's decision to constructively withdraw the No Showback Rule is also inconsistent with the clear intent of Congress to end the cruel practice of horse soring.

120. Therefore, the Agency's withdrawal of the No Showback Rule was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## THIRD CAUSE OF ACTION

**(Violation of the APA and HPA – Non-Referral of Sore Horses for Disqualification)**

121. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

122. The Agency's August 29, 2025 and January 28, 2026 communications announced the Agency's decision to implement a blanket policy under which the Agency will not refer any horses for disqualification, even when it has observed a prohibited act under the HPA, and constituted final agency action. Email from Louis DiVincenti, *supra* para. 99, at 33; Juarez, *supra* para. 100, at 33-34. This decision is directly at odds with not only the Agency's statutory duty to administer the HPA, but also its role in implementing and directing the inspection of horses under the Act. *See e.g.* 15 U.S.C. §§ 1823(c), (e).

123. The HPA requires show management to identify and disqualify sore horses. This includes sore horses identified by the Agency, those identified by DQPs, and those that management should have been aware of, but was not because they failed to assign an inspector. *See* 15 U.S.C. §§ 1824(3), (5).

124. By implementing this blanket policy of not referring sore horses to DQPs or managers for disqualification, the Agency is violating the comprehensive mandate of the HPA to

identify and disqualify sore horses, as well as diverging from the clear intent of Congress to end the cruel and inhumane practice of soring.

125. The Agency's decision not to refer horses for disqualification was also made without any reasoned explanation.

126. The Agency's failure to refer sore horses to show management for disqualification is therefore inconsistent with its overall statutory obligations, and made without a reasoned explanation, and thus is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## FOURTH CAUSE OF ACTION

**(Violation of the APA and HPA – 2024 Final Rule)**

127. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

128. The HPA contains broad and comprehensive prohibitions on horse soring that clearly impose a legal mandate to end it. *See* 15 U.S.C. § 1824 ("Unlawful Acts").

129. The Agency is required by the HPA to issue "rules and regulations . . . necessary to carry out the provisions of this chapter." 15 U.S.C. § 1828.

130. The 2024 Final Rule reflected the culmination of the rulemaking process, including "consideration" of the "written data, views, or arguments" of interested persons and "a concise general statement of [the Final Rule's] basis and purpose." 5 U.S.C. § 553.

131. The Agency concluded in the 2024 Final Rule that the current HPA Regulations were inadequate to prevent horse soring and must be amended to enforce the HPA.

132. By abandoning the 2024 Final Rule and leaving in place the HPA Regulations long-recognized as wholly inadequate to prevent horse soring, *see* 91 Fed. Reg. 3633, the Agency has acted contrary to the legal mandate of the HPA.

133. The Agency's constructive withdrawal of the 2024 Final Rule was also undertaken without compliance with the notice and comment provisions of the APA, 5 U.S.C. § 553, because the APA requires that agencies use the same procedures to amend or repeal rules as they used to issue the original rule. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015). Furthermore, the APA's arbitrary and capricious standard applies equally to rule promulgations and recissions. *See* 5 U.S.C. § 551(5); *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-44 (1983).

134. Because the 2024 Final Rule was promulgated through notice and comment rulemaking, any repeal or amendment must also provide an opportunity for notice and comment on that repeal or amendment. And yet, the Agency did not provide notice or allow for public comment on the decision to withdraw the Rule.

135. In suspending, and constructively withdrawing, the 2024 Final Rule the Agency's actions resulted in reversal of the legal, policy, and factual findings that necessitated the adoption of the Final Rule, without any reasoned explanation to support that reversal, without notice and comment procedures related to withdrawing the Final Rule, and without compliance with the mandate of the HPA. Such actions, therefore, were fundamentally "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law" and taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), 5 U.S.C. § 706(2)(D).

## **REQUESTS FOR RELIEF**

Plaintiffs respectfully request that this Court enter judgment as follows:

A. Declaring that the Agency's constructive withdrawal of the Scar Rule without notice and comment and without reasoned explanation was arbitrary and capricious, an abuse of discretion, not in accordance with law, and made without observance of procedure required by law, in violation of the APA and HPA;

B. Declaring that the Agency's constructive withdrawal of the No Showback Rule was arbitrary and capricious, an abuse of discretion, and not in accordance with law, in violation of the APA and the HPA;

C. Declaring that Agency's decision not to refer any horses for disqualification to DQPs or show management was arbitrary and capricious, an abuse of discretion, and not in accordance with law, in violation of APA and the HPA;

D. Declaring that Agency's decision to constructively withdraw the 2024 Final Rule was arbitrary and capricious, an abuse of discretion, not in accordance with law, and not in accordance with procedures required by law, in violation of the APA and the HPA;

E. Vacating the Agency's decision to constructively withdraw the Scar Rule;

F. Vacating the Agency's decision to constructively withdraw the No Showback Rule;

G. Vacating the Agency's decision not to refer any horses for disqualification;

H. Vacating the Agency's decision to constructively withdraw the 2024 Final Rule;

I. Remanding to the Agency for implementation of the Scar Rule, the No Showback rule, and the disqualification process for anyone other than the plaintiffs in *Gould*. *See Gould*, 2025 WL 2402083, at *8.

J. Remanding to the Agency for implementation of the 2024 Final Rule;

K. Awarding Plaintiffs their costs and reasonable attorneys' fees; and

L. Granting such other declaratory and statutory relief that the Court considers just and proper.

Respectfully submitted this 22nd day of April, 2026.

\s\ Ralph Henry
Ralph E. Henry (D.C. Bar No. 982586)
Kimberly D. Ockene (D.C. Bar No. 461191)
Marie Langlois (MD Bar No. 1712130305)*

Humane World for Animals
1255 23rd Street, NW Suite 450
Washington, DC 20037
rhenry@humanesociety.org
Telephone: (434)987-3366
Facsimile: (202)778-6134

Attorneys for Plaintiffs

*Admission Pro Hac Vice pending